# DEPOSITION EXCERPT OF
# JARED DAVIS

Jarred Davis

20

1    But I don't recall being, in my mind, that
2 we're at day 42 or day 45 or whatever the case may be.
3 Because that wasn't, kind of, within the scope of what I
4 was asked to do in terms of taking a look at this
5 particular file, trying to understand the facts, and
6 draw some investigative determinations.
7    Q.  (BY MR. KING)  Were you given a deadline of
8 when you needed to have the investigations finished?
9    A.  If I had a deadline, I don't recall what that
10 deadline was.
11    Q.  And what date did you finish Ms. [REDACTED]
12 investigation on?
13    A.  May 29, 2015.
14    Q.  Do you recall if you finished others on that
15 day as well or just that one?
16    A.  I don't -- I don't -- because I don't have
17 those others in front of me, I can't, right offhand,
18 answer that; but it is possibly likely.  Because to the
19 extent that there was a deadline looming, I knew that
20 Dr. Keller's interim capacity was coming to an end, and
21 a new vice president was coming on shortly somewhere in
22 that time frame.  So there may be some correlation
23 there.
24    Q.  Now did you ever speak with the new VP,
25 Joanne Woodard?

DepoTexas, Inc.

1 investigation?
2    A. No. I don't recall sitting down to debrief. I
3 think I generally understood that Joanne Woodard would
4 contact me if she had any questions; that kind of thing.
5    Q. So after you completed it, did you have any
6 more contact with Dr. Keller about it?
7    A. No, not in -- not in particular.
8    Q. And after you spoke with Joanne Woodard about
9 it, did you have any more contact with Ms. Woodard about
10 Ms. ▮▮▮▮▮ investigation?
11    A. No.
12    Q. So once you finished all of your
13 investigations, were you finished?
14    A. Yes.
15    Q. Now before you started the investigation into
16 Ms. ▮▮▮▮▮ case, had you had any previous discussions
17 about what had already been investigated?
18    A. I'm sorry, I don't . . .
19    Q. Like, were you give a lot of detail about what
20 had already occurred in Ms. ▮▮▮▮▮ investigation before
21 you picked up the file?
22        MR. MYERS: Objection. Vague.
23    A. What do you mean by "a lot of detail"?
24    Q. (BY MR. KING) Like did you know -- so before
25 you initiated your investigation, had you already been

1  out, is referenced as No. 8 in my investigation report.
2  So it would have been UNT Policy 1.3.7.
3      Q. Okay. And that's Exhibit No. 40?
4      A. Stipulating that the definitions are the same.
5      Q. Sure. Okay. Did you review it?
6      A. Oh, I thought I had answered the question. I'm
7  sorry.
8      Q. Oh, I thought you were still looking.
9      A. No, I was; but I thought I had answered the
10 question.
11     Q. Okay. Forgive me if I asked -- did Dr. Keller
12 say why you were needed to finish?
13     A. Dr. Keller said to me when she called me --
14         MR. MYERS: Let me just -- objection.
15 Hearsay.
16         Go ahead.
17     A. Dr. Keller says, "Jarred, I'm down to no
18 investigators. I have some open cases. Can you help
19 me?" I don't think I understood the "why" beyond she
20 the fact that she had no -- there was no one else.
21     Q. (BY MR. KING) Was is it your understanding
22 this was only going to be a short-term solution for your
23 involvement?
24         MR. MYERS: Objection. Vague.
25     A. I understood that, you know, there were a

1  couple of cases she needed me to take a look at; make
2  sure we dot our "i's" and cross our "t's." I don't know
3  that I had any purview beyond what she was asking me to
4  do in that instance.
5      Q.  (BY MR. KING) And have you -- since you
6  completed these investigations, have you done any other
7  investigations for UNT?
8      A.  I haven't.
9      Q.  Did you review any documents that weren't
10 already in the file that you got?
11     A.  Did I review any documents that were not
12 already in the file? Not to my recollection.
13     Q.  Did you review the text messages between
14 Ms. ███████ and Mr. Rankins?
15     A.  I believe I did.
16         MR. KING: Can we go off the record real
17 quick?
18         (Break taken from 4:03 p.m. to 4:12 p.m.)
19     Q.  (BY MR. KING) Okay, Mr. Davis, just real
20 briefly. When you turned in your report on May 29th, do
21 you recall about what time that was?
22     A.  I don't.
23     Q.  Do you know if it would've been morning or
24 afternoon?
25     A.  I don't.

1  Q. So was your purpose for being hired only to
2  finish investigating those current cases?
3  A. Correct.
4       MR. MYERS: Objection --
5  Q. (BY MR. KING) And was one of those cases
6  Ms. ██████?
7  A. Yes.
8  Q. Do you recall, the best you can remember, about
9  when you actually started working on her case?
10 A. I don't recall that.
11 Q. And once you were brought on, what steps did
12 you take to actually complete the investigation?
13 A. I recall taking Ms. ██████'s investigative file
14 and taking a look, first, at the complaint that she
15 submitted to the Office of Equal Opportunity. And kind
16 of going through what I understood to be the
17 investigative notes of Ms. Gould; taking a look at all
18 the information that was in the file. And first trying
19 to determine if there was any new information that I
20 thought I needed to get in order to bring the
21 investigation to some type of determination.
22      So that was kind of what I recall doing in
23 Ms. ██████ case.
24 Q. Okay. Do you recall exactly what was in the
25 file when you received it?

1   A.  I wouldn't be able to recall everything that
2   was in the file. I recall -- vaguely, I recall the
3   complaint, statements, and interview notes, generally.
4       Q.  Okay. I'm going to show you just a couple of
5   the exhibits that we have.
6       A.  Sure.
7       Q.  It was marked earlier as Exhibit 28.
8           Do you recall seeing that in the file?
9       A.  I want to say I do recall seeing this in the
10  file.
11      Q.  And I'm going to show you Exhibit 29.
12          Do you recall seeing that too?
13      A.  I'm unable to confirm that I did see it or I
14  did not. I don't remember.
15      Q.  Okay. And then Exhibit 33.
16          Do you recall seeing that one too?
17      A.  I believe I did --
18      Q.  Okay.
19      A.  -- see that.
20      Q.  Is there anything else that you recall seeing
21  in the file that stood out?
22              MR. MYERS: Objection. Vague.
23      A.  No.
24      Q.  (BY MR. KING) Do you recall if it was like a
25  thick file or a thin file?

1  MR. MYERS: Objection. Vague.
2  A. I can't -- I mean, it's been several -- it's
3  been a while ago --
4  Q. (BY MR. KING) Sure.
5  A. -- and there were several files. It'd be
6  different if we were only talking about -- if I only
7  handled one file; so I'm not sure.
8  Q. Sure.
9      Do you recall, from what you remember, the
10 last date in the file that you saw that was the last
11 date that Ms. Gould had done any work on the case?
12 A. I wouldn't have been looking. That wouldn't
13 have been a detail that I would've filed away because I
14 was primarily looking for just items in the file that --
15 not necessary dates of items in the file.
16     So to answer your question directly, no, I
17 wouldn't recall that.
18 Q. Okay. Do you recall, kind of, the specifics of
19 what that case was about or this investigation?
20 A. Do I recall specifics? I recall -- I recall
21 the general allegations of the case.
22 Q. And what do you recall -- remember that to be?
23 A. I recall Ms. ████ alleging sexual violence by
24 a UNT employee on an evening which she stayed overnight.
25 That's what I, kind of, generally recall.

1 that I clearly understood what the complainant was
2 complaining of and what the complainant's version of the
3 story was kind of couched with or held against what the
4 respondent's response was. So making sure I clearly had
5 those two things nailed down to see what additional
6 information I needed.
7 　　　　So I probably would've created a "straw
8 man" of sorts to say: Ms. ▬▬▬ is alleging A, B, C,
9 and D -- which she believes constitutes, you know,
10 sexual violence, for the sake of this conversation --
11 and Mr. Rankins' response to that is: A, B, C, and D.
12 And then letting that guide the inquiry from there.
13 　　Q.　And when you started your investigation, did
14 you ever speak to Ms. Gould about the work that she had
15 done?
16 　　A.　No, I did not.
17 　　Q.　And do you recall thinking or remember thinking
18 how much more investigation you thought needed to be
19 done?
20 　　A.　No. I don't recall having that thought.
21 　　Q.　And I'm going to show you Exhibit 6. And I
22 believe this is your investigation summary.
23 　　A.　Okay.
24 　　Q.　Did you regularly speak with Dr. Keller while
25 you were investigating?

1  A. No.
2  Q. Did you ever speak with Ms. ▓▓▓▓ when you had
3  the investigation?
4  A. No. I did not ever speak directly with
5  Ms. ▓▓▓▓.
6  Q. And how come?
7  A. Based on what I understood to be in the file in
8  terms of investigative notes; based on her complaint;
9  based on what I perceived; what I recall in the file
10 showing that there had been some follow-up
11 communication; based on the fact that I had no follow-up
12 questions regarding what I understood her allegations to
13 be, I saw no need to contact her directly.
14 Q. What about Mr. Rankins? -- did you contact him?
15 A. No.
16 Q. And how come?
17 A. For the same reasons I didn't feel the need to
18 contact Ms. ▓▓▓▓.
19 Q. Did you ever contact any of the witnesses that
20 Ms. Gould had spoken to such as the Pablo Olguin?
21 A. No, I didn't. I think that Ms. Gould was quite
22 clear in her notes and things of what their version of
23 events and to what extent their testimony was useful in
24 drawing an investigative determination. I didn't see
25 the need to contact them either.

1  Q. Did you ever speak with anybody in the Denton
2  Police Department?
3  A. No, I did not.
4  Q. As you became more familiar with the case and
5  what was in Ms. Gould's notes and all that, what did you
6  do then? What did you do next?
7  A. I think started moving towards saying, "Okay.
8  You know, this is what Ms. ▮▮▮▮ says happened; this is
9  what Mr. Rankins has said happened; here's what we're
10 able to corroborate in terms of facts." And laying
11 those facts out and allowing those facts to lead me to
12 the investigation determination and the analysis of
13 those facts in forming the determination, which I think
14 you see in the creation of this document that I
15 authored, this investigative report.
16         It's really just kind of extracting what I
17 understand to be the facts and letting them guide me to
18 the conclusion.
19 Q. Okay. Can I see your report?
20 A. Sure.
21 Q. Okay. There you go.
22         Now did you ever see any results of any
23 kind of a toxicology test performed on Ms. ▮▮▮▮?
24 A. I don't recall.
25 Q. Did you ever have any contact with

1  Rodney Mitchell?
2      A.  No.  I don't know who Rodney Mitchell is.
3      Q.  So who -- did you talk to anybody during the
4  course of your investigation?
5      A.  I'm sorry.  I'm not sure I understand your
6  question.
7      Q.  Was there anybody that you went out and
8  interviewed that Ms. Gould had not already talked to?
9      A.  No.  I did not personally interview any
10 additional people that Ms. Gould had not interviewed or
11 talked to.
12     Q.  And when you picked up, you know, the files
13 that you were going to conduct the investigations on,
14 did you pick up, like, the hard, like, paper files?  Or
15 did you get everything e-mailed to you?
16     A.  No.  I went to Denton and picked up paper
17 files.
18     Q.  Okay. And when you were, you know, going
19 through the process of going through the files and doing
20 your investigation, where did you do that at?
21     A.  At my home.
22     Q.  And was this in the course of working on those
23 other cases you were assigned as well?
24     A.  Correct.
25     Q.  Did you handle those investigations in the same